UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DUSTIN GORDON,

       Plaintiff,                              Hon. Robert Holmes Bell

v.                                                Case No. 1:06 CV 571

PATRICIA CARUSO, et al.,

       Defendants.

_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on <u>Defendants' Renewed Motion for Summary Judgment</u>. (Dkt. #101). Pursuant to 28 U.S.C. § 636(b)(1)(B), the Court recommends that Defendants' motion be **granted** and Plaintiff's action **dismissed**.

## BACKGROUND

The following allegations are contained in Plaintiff's complaint. (Dkt. #1). Plaintiff is a member of the Asatru faith.[1] While the Michigan Department of Corrections (MDOC) recognizes the Asatru faith, it does not permit its adherents to engage in group worship services. Plaintiff asserts that group worship services are essential to the practice of his religion. Plaintiff initiated the present action against various prison officials claiming that his inability to participate in group worship services with other members of the Asatru faith violates his constitutional rights to freely practice his religion and to enjoy the equal protection of the laws and, furthermore, constitutes a substantial burden to the exercise

---

[1] The Asatru faith is also known as Odinism. (Dkt. #39).

of his religious faith in violation of the Religious Land Use and Institutionalized Persons Act (RLUIPA). Plaintiff has sued Defendants in their personal and official capacity seeking declaratory and injunctive relief only. (Dkt. #1; Dkt. #87, Exhibit 4 at 6-9).

On January 16, 2007, Defendants moved for summary judgment. (Dkt. #16). Finding that legitimate security concerns justified the decision to prevent members of the Asatru faith from engaging in group worship services, the undersigned recommended that Defendants' motion be granted and Plaintiff's action dismissed. (Dkt. #43). The Honorable Wendell A. Miles disagreed, however, finding that there existed legitimate factual questions concerning Defendants' entitlement to relief. (Dkt. #47). Accordingly, Judge Miles denied Defendants' motion for summary judgment.

Defendants later moved again for summary judgment based on previously submitted evidence as well as the opinions expressed by their expert witness. (Dkt. #86). Finding that the report submitted by Defendants' expert was not properly authenticated, the undersigned recommended that Defendants' motion be denied on the ground that Defendants had failed to submit any additional *admissible* evidence in support thereof. (Dkt. #97). In response to this recommendation, Defendants filed a motion to supplement in which they submitted a properly authenticated expert report. (Dkt. #101). In light of this submission, Defendants asked the Court to reconsider their motion for summary judgment. The Honorable Robert Holmes Bell adopted in part the undersigned's recommendation, finding that while Defendants had failed to support their motion with additional admissible evidence, Plaintiff's claims against several Defendants were now moot. (Dkt. #115). Judge Bell further instructed this Court to consider Defendants' motion to supplement and renewed motion for summary judgment.

The Court subsequently granted Defendants' motion to supplement and agreed to reconsider their motion for summary judgment. (Dkt. #119). Plaintiff was informed that he had until

July 3, 2009, to "respond to Defendants' motion or otherwise supplement his previous response." Plaintiff has submitted a supplemental response to Defendants' motion for summary judgment and the matter is ready for decision. For the reasons articulated below, the undersigned recommends that Defendants' motion for summary judgment be granted and Plaintiff's action dismissed.

## **STANDARD**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party moving for summary judgment can satisfy its burden by demonstrating "that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005); *see also*, *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The fact that the evidence may be controlled or possessed by the moving party does not change the non-moving party's burden "to show sufficient evidence from which a jury could reasonably find in her favor, again, so long as she has had a full opportunity to conduct discovery." *Minadeo*, 398 F.3d at 761 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)).

Once the moving party has met its burden of production, the non-moving party "must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial." *Amini*, 440 F.3d at 357 (citing *Anderson*, 477 U.S. at 247-48; *Celotex Corp. v. Catrett*, 477 U.S. at 324). While the Court must view the evidence in the light most favorable to the nonmoving party, the party opposing the summary judgment motion "must do more than simply show that there is

some metaphysical doubt as to the material facts." *Amini*, 440 F.3d at 357. The existence of a mere "scintilla of evidence" in support of the non-moving party's position is insufficient. *Daniels v. Woodside*, 396 F.3d 730, 734-35 (6th Cir. 2005) (quoting *Anderson*, 477 U.S. at 252). The non-moving party "may not rest upon [his] mere allegations," but must instead present "significant probative evidence" establishing that "there is a genuine issue for trial." *Pack v. Damon Corp.*, 434 F.3d 810, 813-14 (6th Cir. 2006) (citations omitted).

Moreover, the non-moving party cannot defeat a properly supported motion for summary judgment by "simply arguing that it relies solely or in part upon credibility determinations." *Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004). Rather, the non-moving party "must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and. . .may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Id.* at 353-54. In sum, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Daniels*, 396 F.3d at 735.

## ANALYSIS

**I.     First Amendment**

Plaintiff asserts that his First Amendment right to freely practice his religion is violated by Defendants' refusal to permit group services for members of the Asatru faith. Defendants assert that they are entitled to summary judgment because their action is reasonably related to a legitimate penological interest.

It is well accepted that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *see also, Turner v. Safley*, 482 U.S. 78, 84 (1987) ("[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution"). Specifically, prisoners retain the First Amendment protection to freely exercise their religion. *See O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987) (citations omitted). Nevertheless, operating a prison is a difficult task requiring "expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner*, 482 U.S. at 85.

Recognizing this, courts have consistently held that issues involving "the adoption and execution of policies and practices that in [the] judgment [of prison officials] are needed to preserve internal order and discipline and to maintain institutional security" in most circumstances "should be accorded wide-ranging deference." *Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (quoting *Wolfish*, 441 U.S. at 547); *see also*, *Bazzetta v. McGinnis*, 124 F.3d 774, 779 (6th Cir. 1997) (issues involving prison administration are properly resolved by prison officials, and the solutions at which they arrive should be accorded deference).

Accordingly, when reviewing an inmate's claim of constitutional violation, courts must balance this policy of judicial restraint with the need to protect inmates' constitutional rights. *See Turner*, 482 U.S. at 85. The standard by which this balancing occurs was articulated by the *Turner* Court, which held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. This standard represents a "reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Flagner*, 241 F.3d at 481 (quoting *Shabazz*, 482 U.S. at 349). The

*Turner* Court identified four factors that are relevant in determining the reasonableness of a challenged prison regulation:

1. there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;

2. whether there are alternative means of exercising the right that remain open to prison inmates;

3. the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and

4. whether there are ready alternatives available that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.

*Flagner*, 241 F.3d at 484 (quoting *Turner*, 482 U.S. at 89-91).

Failure to satisfy the first factor renders the regulation unconstitutional, without regard to the remaining three factors. If the first factor is satisfied, the remaining three factors are considered and balanced together; however, they are "not necessarily weighed evenly," but instead represent "guidelines" by which the court can assess whether the actions at issue are reasonably related to a legitimate penological interest. It should further be noted that the *Turner* standard is not a "least restrictive alternative" test requiring prison officials "to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." Instead, the issue is simply whether the policies at issue are reasonably related to a legitimate penological interest. *Id.*

To establish that his right to freely practice his religion has been violated, Plaintiff must establish that: (1) the belief or practice he seeks to protect is religious within his own "scheme of things," (2) that his belief is sincerely held, and (3) the Defendant's behavior infringes upon this practice or belief. *Kent v. Johnson*, 821 F.2d 1220, 1224-25 (6th Cir. 1987); *see also*, *Bakr v. Johnson*, 1997 WL 428903 at *2 (6th Cir., July 30, 1997) ("sincerely held religious beliefs require accommodation by prison

officials"); *Barhite v. Caruso*, 2009 WL 440682 at *2 (W.D. Mich., Feb. 23, 2009). Plaintiff's submissions satisfy the first two elements and Defendants do not dispute that denying Plaintiff's request for group worship infringes on his beliefs. The question, therefore, becomes whether Defendants' action is reasonably related to a legitimate penological objective.

As Defendants contend, the connection between white supremacy and Asatru is well documented. *See, e.g., McClain v. Leisure*, 192 Fed. Appx. 544, 545-46 (7th Cir., Aug. 23, 2006) (prison officials discovered a painting, created by an Asatru member, which depicted symbols associated with white supremacy and the Asatru religion); *Wood v. Maine Department of Corrections*, 2008 WL 2222037 at *1-2 (D. Maine, May 22, 2008) (prison officials discovered that the facility's Asatru members had secreted the following items in their "Asatru group locker": handwritten symbol of the Aryan Nation, handmade banners depicting Aryan symbols, pictures of Adolf Hitler, and an envelope with a swastika drawn on the back); *Lindell v. Houser*, 442 F.3d 1033, 1034 (7th Cir. 2006) (observing that Asatru is "a pagan religion often associated with a white-supremacist philosophy"); *Lindell v. Casperson*, 360 F.Supp.2d 932, 942-43 (W.D. Wis. 2005) (observing that Odinism promotes "white supremacy or hatred towards other races"); *Lindell v. McCallum*, 352 F.3d 1107, 1108 (7th Cir. 2003) (noting that Asatru has identified the "Nordic Race" as the "chosen people, implying white supremacy"); *Borzych v. Frank*, 2005 WL 2206785 (W.D. Wis., Sept. 9, 2005) (denial of inmate's request for certain Asatru material was appropriate as such is associated with white supremacy); *In the Belly of the Whale: Religious Practice in Prison*, 115 Harv. L. Rev. 1891, 1903-04 (2002) (recognizing that in response to prison policies that "hinder the ability of white supremacist groups to organize as distinct religious faiths," white supremacists have turned to "pagan religions" such as "Odinism and Asatru"); Frank Green, *"Kindreds" Growing: Asatru Groups in Prison Said to Attract Racists*, Richmond Times-

Dispatch, May 20, 2001, 2001 WLNR 1136984 (Asatru attracts white supremacists and approximately 40-50 percent of Asatru members are "militant" racists).

Defendants have also submitted a report from their expert, Dr. Gregg W. Etter, Sr., Ed.D., Assistant Professor of Criminal Justice, University of Central Missouri. (Dkt. #102). Dr. Etter has authored a study of Asatru in which he concludes that "[p]ractitioners of Asatru/Odinism/Wotanism have a demonstrated connection with white supremacists and other [security threat groups]." Dr. Etter further observes that Asatru members "have also been involved in assaults on other inmates and staff." As one example, Dr. Etter describes a January 2000 incident that occurred in a Virginia prison in which two Asatru members sacrificed another inmate as part of an Asatru ritual. Dr. Etter also describes the white supremacist origins of the modern Asatru movement. With respect to Mike Murray, leader of the Asatru Alliance, and one of the individuals who Plaintiff cites as an authority on the Asatru faith, Dr. Etter observes that Murray used to be a member of the American Nazi Party.[2]

Defendants assert that they denied Plaintiff's request to permit Asatru group worship based on legitimate security concerns, specifically that permitting such would provide "cover" for white supremacists to "spread white supremacist ideology and the recruit converts to the white supremacist ideology." (Dkt. #21). Defendants believe that permitting Asatru group worship would "inevitably" lead to racial conflict within the prison. *Id.*

Plaintiff asserts that he is not a white supremacist or racist. Plaintiff has also submitted evidence refuting Dr. Etter's interpretation and analysis of Asatru (and presumably the similar observations of the various courts identified above). The Court finds such evidence to be of little (if any)

---

[2] The Court notes that this observation is consistent with an "Intelligence Report" authored by the Southern Poverty Law Center. *See* The New Barbarians, available at http://www.splcenter.org/intel/intelreport/article.jsp?aid=451 (last visited on June 10, 2009).

-8-

relevance. Defendants have not denied Plaintiff's request for Asatru group worship because *Plaintiff* is a racist or white supremacist. Instead, Defendants fear that permitting such group activity will attract others who do hold such beliefs and that such represents a threat to the institution and all those who live and work therein. As previously noted, there exists substantial evidence that the Asatru faith serves in many instances as a haven for racists and white supremacists. Plaintiff has submitted no evidence to the contrary. In fact, at least one of the Asatru "experts" on who Plaintiff relies acknowledges that racists and white supremacists have flocked to the Asatru banner. Plaintiff has submitted a letter authored by Jane Ruck, the "religious leader" of the Northern Way Asatru Ministries. (Dkt. #45, Exhibit A, Jane Ruck Letter). In her letter, Ruck acknowledges that many so-called Asatru followers "are abusing our beliefs to advance their social and political agendas." *Id.* at 3.

The relevant question is not whether Asatru is inherently dangerous as Dr. Etter seems to suggest or is instead a peaceful religion that is misused by unpeaceful people as Plaintiff asserts. Instead, the relevant question is whether Asatru attracts dangerous people to its banner and in so doing represents a legitimate threat to prison security, as this is the basis for Defendants' denial of Plaintiff's request for Asatru group services. On this question, the evidence is overwhelming. Dr. Etter has concluded that Asatru serves as a haven for white supremacists. Various courts have recognized the connection between Asatru and white supremacy. Newspapers and law reviews have reached the same conclusion. Plaintiff offers no evidence to the contrary.

Prison officials certainly have a legitimate interest in preventing racial conflict and violence within prison. The connection between this legitimate interest and the decision to deny Asatru group worship is valid and rational and, therefore, satisfies the first *Turner* factor. Consideration of the remaining factors weighs heavily in Defendants' favor. As Defendants observe, Plaintiff is not

prevented from following the Asatru faith in private. The MDOC recognizes the Asatru faith and permits the adherents thereof to possess appropriate items to facilitate the practice of such. *See* Mich. Dep't of Corr., Policy Directive 05.03.150. Moreover, members of the Asatru faith are permitted to possess literature regarding Asatru and may receive "clergy and outreach volunteer visits." (Dkt. #32, Exhibit B7).

Plaintiff is not being denied the right to belong to the faith of his choosing, but is simply being denied the opportunity to participate in group worship services because of the legitimate security threat such would create. Considering the seriousness of the threat posed by Asatru group worship, Defendants' conduct is reasonably related to a legitimate penological interest. As previously noted, the Court is instructed to accord "wide-ranging deference" to the judgment of professional prison administrators on issues of discipline, internal order, and security. To permit Plaintiff's claim to go forward would require that this Court do the very thing it is commanded not to do, namely substitute its judgment for that of experienced, professional prison administrators. The Court recommends, therefore, that Defendants are entitled to summary judgment as to Plaintiff's First Amendment claim.

**II.     RLUIPA**

In relevant part, RLUIPA prohibits any government from imposing a "substantial burden on the religious exercise" of a prisoner, unless such burden constitutes the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000cc-1(a). RLUIPA does not define the phrase "substantial burden." Nonetheless, courts have concluded that a "burden" on religious exercise is "substantial" only where such imposes "a significantly great restriction or onus upon such exercise" which "directly coerces the religious adherent to conform his or her behavior accordingly." *Sanders v.*

*Ryan*, 484 F.Supp.2d 1028, 1034 (D. Ariz. 2007) (quoting *Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th Cir. 2005)); *Konikov v. Orange County, Florida*, 410 F.3d 1317, 1323 (11th Cir. 2005).

To come within the scope of RLUIPA the burden in question must render religious exercise "effectively impracticable." *Marshall v. Frank*, 2007 WL 1556872 at *5 (W.D. Wis., May 24, 2007) (quoting *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003)); *see also*, *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) (recognizing that RLUIPA's institutionalized persons provision was intended to alleviate only "exceptional" burdens on religious exercise). Moreover, a burden is less than "substantial" where it imposes merely an "inconvenience on religious exercise." *See, e.g., Konikov*, 410 F.3d at 1323. These conclusions recognize that RLUIPA was not intended to create a cause of action in response to every decision which serves to inhibit or constrain religious exercise, as such would render meaningless the word "substantial." *See Civil Liberties for Urban Believers*, 342 F.3d at 761.

Plaintiff bears the burden to establish that his ability to exercise his religion has been substantially burdened. *See Kaufman v. Schneiter*, 474 F.Supp.2d 1014, 1025 (W.D. Wis. 2007). Plaintiff has presented evidence that Defendants' denial of his request for Asatru group worship substantially burdens his ability to practice his religion. Defendants have failed to submit evidence to the contrary. Accordingly, the Court concludes that there exists a genuine dispute of material fact as to this prong of the analysis.

As previously noted, even if a challenged action creates a "substantial burden on the religious exercise" of a prisoner, it will survive scrutiny if it constitutes the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000cc-1(a). As previously discussed, Defendants denied Plaintiff's request to participate in group worship services because of safety and

security concerns. Again, there is no question that prison officials have a compelling interest in preventing racial tension and violence in prisons. Defendants have determined that permitting members of the Asatru faith to conduct group ceremonies presents a very real threat of racially-based violence. As detailed above, the evidence supporting this conclusion is substantial.

While RLUIPA provides certain protections to an inmate's ability to express his religious faith, RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety." *Cutter*, 544 U.S. at 722-23. In this regard courts must accord "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Id.*

In the exercise of their professional judgment, Defendants have reasonably concluded that permitting Asatru group worship would present a threat to the institution and all those who live and work therein. Defendants have not, however, prevented Plaintiff from practicing his religion. As previously noted, the MDOC recognizes the Asatru faith and permits the adherents thereof to possess appropriate items to facilitate the practice of such. Members of the Asatru faith are also permitted to possess literature regarding Asatru and may receive "clergy and outreach volunteer visits."

The Court finds that the decision to deny group worship services to Asatru members, while affording them substantial alternative avenues to practice their faith, constitutes the least restrictive means of pursuing the compelling governmental interest of preventing the promotion of white supremacy and racial conflict. In reaching this conclusion, the Court reiterates that it is not permitted to substitute its judgment for that of Defendants, professionals charged with safely operating the Michigan Department of Corrections. Defendants' judgment in this instance is eminently reasonable and

supported by overwhelming evidence. Accordingly, the Court recommends that Defendants' motion for summary judgment be granted as to Plaintiff's RLUIPA claim.

**III.        Equal Protection**

Plaintiff asserts that Defendants have violated his right to equal protection under the law by permitting certain religious groups, of whom most (if not all) members are African-American, to participate in group worship services. Specifically, Plaintiff asserts that

> Every single racist, supremacist, separatist accusation that Defendants lodge against Asatru (with absolutely no evidence to back up such accusations, Plaintiff points out) is true about the beliefs of the Nation of Islam and the Moorish Science Temple of America, and is openly espoused in their religion and literature.

(Dkt. #32 at 18).

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Accordingly, the state "cannot make distinctions which either burden a fundamental right, target a suspect class, or intentionally treat one differently from others similarly situated without any rational basis for the difference." *Radvansky v. City of Olmstead Falls*, 395 F.3d 291, 312 (6th Cir. 2005) (citations omitted).

In support of this particular claim, Plaintiff has submitted an affidavit in which he asserts that "M.D.O.C. officials allow African American inmates to have religious group services that have racist, supremacist, and separatist teachings as central tenets of these religions." (Dkt. #32, Exhibit A). In his brief opposing Defendants' motion, Plaintiff identifies the Nation of Islam and the Moorish American Science Temple as two religions which allegedly promote racial hatred. (Dkt. #32 at 14-21).

However, Plaintiff offers no specific facts to support these generalized assertions. Moreover, Plaintiff has failed to establish that he possesses first-hand knowledge of such matters or that he is otherwise qualified to render an opinion regarding the teachings of other religions or the beliefs held by the adherents thereto.

On the other hand, as detailed above, Defendants have submitted evidence demonstrating that there exists a rational basis (the prevention of racially motivated prison violence) for treating members of the Asatru faith differently (vis-a-vis requests to participate in group worship) from groups like the Nation of Islam and the Moorish American Science Temple. As Plaintiff has submitted no evidence demonstrating the existence of a genuine factual dispute regarding this claim, the Court recommends that Defendants are entitled to summary judgment as to Plaintiff's Equal Protection claim.

## CONCLUSION

For the reasons articulated herein, the undersigned recommends that <u>Defendants' Renewed Motion for Summary Judgment</u>, (dkt. #101), be **granted** and Plaintiff's action **dismissed**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

Respectfully submitted,

Date: July 6, 2009
    /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge